IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

Michael E. Hamm,                           ) CIVIL ACTION NO. 9:15-2734-RMG-BM
                                           )
                    Plaintiff,             )
                                           )
v.                                         )    **REPORT AND RECOMMENDATION**
                                           )
Holly Scaturo; NFN Chuma, Mr. Ziggy;       )
NFN Dawson; NFN Pratt; NFN Borum;          )
NFN Sanders; NFN Trapp;NFN Harnett;        )
and NFN Meyers, Nurse Practitioner,        )
                                           )
                    Defendants.            )
_____    )

This action was originally filed by the Plaintiff in the South Carolina Court of

Common Pleas, Richland, County.  Plaintiff, a civilly committed inmate under the South Carolina

Sexually Violent Predator's Act (SVPA), S.C.Code Ann. § 44-48-60, et seq., filed this action pro

se alleging violations of his constitutional rights by the named Defendants.  As Plaintiff asserts his

claims through 42 U.S.C. § 1983[1] as well as the Americans with Disabilities Act (ADA), the

Defendants removed the case to this United States District Court on July 9, 2015 on the basis of

federal question jurisdiction.

_____

[1]42 U.S.C. § 1983 "'is not itself a source of substantive rights,' but merely provides 'a method
for vindicating federal rights elsewhere conferred.'"  Albright v. Oliver, 510 U.S. 266, 271 (1994)
(quoting Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979)).  A civil action under § 1983 allows "a
party who has been deprived of a federal right under the color of state law to seek relief." City of
Monterey v. Del Monte Dunes at Monterey, Ltd., 526 U.S. 687, 707 (1999).  To state a claim under
§ 1983, a plaintiff must allege two essential elements: (1) that a right secured by the Constitution or
laws of the United States was violated, and (2) that the alleged violation was committed by a person
acting under the color of state law.  West v. Atkins, 487 U.S. 42, 48 (1988).

1



Following some confusion over the exact nature of Plaintiff's claims, on August 24, 2015, Plaintiff was granted twenty (20) days to file an amended Complaint with this Court setting forth with specificity the claims he is intending to assert in this lawsuit and the Defendants against whom those claims are being asserted. Plaintiff thereafter filed an amended Complaint on September 3, 2015. The Defendants then filed a motion for summary judgment pursuant to Rule 56, Fed.R.Civ.P., on February 12, 2016, along with some additional attachments on February 13, 2016.

As the Plaintiff is proceeding pro se, a Roseboro order was entered by the Court on February 16, 2016, advising Plaintiff of the importance of a dispositive motion and of the need for him to file an adequate response. Plaintiff was specifically advised that if he failed to respond adequately, the Defendants' motion may be granted, thereby ending his case. Plaintiff thereafter filed a response in opposition to the Defendants' motion March 24, 2016.

The Defendants' motion is now before the Court for disposition.[2]

## Background and Evidence

Plaintiff alleges in his verified Complaint[3] that on or about February 25, 2015 he was being taken to "medical", and that as he was "wheeled up to the door in an over-size wheelchair" the Defendant Pratt (a nurse) asked him to "walk to see Doctor Shaver". Plaintiff alleges he told Pratt that he could barely walk or stand. Even so, Plaintiff alleges that after two days of not receiving a

---

[2]This case was automatically referred to the undersigned United States Magistrate Judge for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(d) and (e), D.S.C. The Defendants have filed a motion for summary judgment. As this is a dispositive motion, this Report and Recommendation is entered for review by the Court.

[3]In this Circuit, verified complaints by pro se litigants are considered as affidavits with respect to any factual allegations contained therein that are based on personal knowledge. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).



smaller wheelchair or walker, he decided to walk as had been suggested by Dr. Shaver and the nursing staff so that he would not "stiffen-up due to [his] rheumatoid arthritis". Plaintiff alleges that his medical needs were not being met due to the failure of the medical department to supply him with a walker. However, Plaintiff alleges that even though he had been told they did not have any smaller wheelchairs or a walker, that on or about February 26, 2015 a nurse "Hickman" brought him a walker. Plaintiff goes on to allege that, apparently on February 5, 2015 (before he got his walker), he was struggling to get to the closest set of tables by the stairs for dinner when his legs gave out on him, requiring some other residents to help him get to the table.

Plaintiff alleges that because of these "facts" he was found guilty of faking his injuries and was moved from the Congaree to the Edisto Unit, where he was put into a "freezing cold room" in the dead of winter. Plaintiff complains that he had no ADA equipped shower, room, or ramp access to get to the recreation area or to go to the canteen, and that he has trouble getting in front of the televisions to watch tv due to the small confines of the "Milieu". Plaintiff also complains that he has to "go all the way around the Unit to get to the microwave or refrigerator due to the wall that runs down the center of the milieu to the steps". Plaintiff further alleges that he has "mishaps of urine and stool" due to his not being able to get to his room on time, which is "embarrassing and dehumanizing", and that the walker he received on February 26, 2015 is unsafe due to the type of wheels it has on it.

Plaintiff also complains that he is being deprived of sleep because his room is only two doors down from the medical entrance, and that there is too much traffic and door slamming. Plaintiff further complains that despite the noise, earplugs are banned due to safety concerns. As such, Plaintiff complains that he is not being given the "minimal civilized measure of life's



necessities". Plaintiff further states that he is seeking relief under the Omnibus Adult Protection Act, the ADA, and the Rehabilitation Act.[4] Plaintiff also complains about his placement in the facility, and that medical personnel think his medical problems are "psychosomatic", even though they have failed to really run all of the tests they need to run. Plaintiff wants to be put back in his old room in the Congaree Unit, have his "green level" restored, as well as be awarded monetary damages for the pain and suffering he has had to endure as a result of his treatment.

Plaintiff also complains that on or about February 19, 2015 he was told by Nurse Hickman that he was going to see the neurologist for his back and loss of muscle use with his legs, and that the Defendant Dawson was sent to help him dress and put his shoes on, but that Dawson "did not take the care necessary to make sure my back . . . was not agitated". Plaintiff alleges that he told Dawson to slow down and that he [Dawson] was hurting him, but that Dawson responded that he was going slow and not hurting him. Plaintiff further complains that when they then helped him into his wheelchair, he was "handled too roughly and causing my rheumatoid arthritis to hurt more than it already was, along with my lower back issue". Plaintiff then complains that the wheelchair he had would not fit through all of the doors in the Congaree Unit, so he had to get out of the wheelchair to get past some of the doors, then be put back in his wheelchair. Plaintiff further complains that while Dawson was pushing the wheelchair he kept "hitting every single door frame with jarring force", causing him pain. Plaintiff then alleges that when he got to the van, no seat belt

---

[4]While Plaintiff cites to both the ADA and the Rehabilitation Act, the standards for considering these claims are the same. Smaw v. Commonwealth of Virginia Department of State Police, 862 F.Supp. 1469, 1474 (E.D.Va. 1994) ["By design, the ADA standards mirror those of the Rehabilitation Act in this case....The emergence of the ADA does not create a new avenue for claims in the area of disability discrimination; rather, the ADA incorporates the existing language and standards of the Rehabilitation Act in this area."]; Hooven-Lewis v. Caldera, 249 F.3d 259, 268 (4th Cir. 2001).



was put on him to hold him in place and they also brought a "broken down walker" for him to use instead of taking the wheelchair along for his use.  Plaintiff then alleges that when they returned from transport, Dawson was "yanking off" his shoes without even taking the time to untie them, causing Plaintiff "undue pain and stress on my injured back".

Plaintiff alleges on or about February 19, 2015 he was told to get ready for another transport to have an MRI taken.  Plaintiff alleges that "Dawson again dressed [him] and put on [his] shoes with no care for [his] condition".  Plaintiff alleges that he then again had to be helped from his room to the stairs to be put in the wheelchair, that Dawson again hit all the door frames, and that at one point he had to go down six steps with his hands handcuffed and then wait for the wheelchair to be brought to him to sit back down again.  Plaintiff alleges that he was not supposed to have his hands shackled, because it renders him unable to help himself if he falls or if "an assault happens".  Plaintiff alleges that when they came back from transport, Dawson allowed him to be transported from the Edisto Unit to the Congaree Unit with both his hands and feet shackled, with Plaintiff again having to walk up six steps to get back into his wheelchair.  Plaintiff alleges that this treatment violated the standards for medical care for civilly committed detainees, thereby also making it a violation of the ADA and the Rehabilitation Act.

Plaintiff alleges that on or about February 19, 2015 the Defendant Sanders was the security officer that transported him to Palmetto Imaging for an MRI.  Plaintiff alleges that when "they" were trying to get him ready for transport, Sanders kept yelling at Dawson to "hurry it up".  Plaintiff alleges that Sanders knew that he was having medical issues with his legs and lower back, but that "she did not care".  Plaintiff also again complains about being shackled during transport, and that at certain times he had to walk short distances when the wheelchair would not fit through a door,



or when he had to take those "six steps". Finally, Plaintiff also complains about another transport on or about March 5, 2015, when he had to be transported to Palmetto Imaging to have x-rays done on his hand. Plaintiff complains that on this trip the pull-out step to help get into the van would not pull out, that it was also too tight a fit to "squeeze though" into the van, all while the handicap van was sitting in the parking lot but was not used, when it should have been to accomplish this transport. In addition to Dawson and Sanders, Plaintiff alleges that the Defendants Borum and Chuma (whom Plaintiff also refers to as "Ziggy") should be liable because they should have stopped Sanders and Dawson from engaging in this conduct.

Plaintiff also alleges that on or about February 25, 2015, when he was transferred to the Edisto Unit in the oversized wheelchair, the Defendant Nurse Trapp told him that he was on room restriction due to the fact that there was no room for the oversized wheelchair. Plaintiff alleges that when he inquired about the availability of a walker, Trapp told him that he did not have a walker, and that he was taking the wheelchair and that Plaintiff should stay in his room. Plaintiff alleges that he told Trapp that he was not going to stay in his room, and that he would crawl out of his room if he had too. Plaintiff alleges that Trapp responded by telling Plaintiff that he should not come to "medication call", and that he [Trapp] would bring Plaintiff's medication to him. Plaintiff alleges that the following day, February 26, 2016, when Plaintiff was on his way out from seeing Dr. Shaver, Nurse Trapp made the comment that if Plaintiff was in that bad of shape, he should be on bed rest. However, Plaintiff alleges that Dr. Shaver told him that he needed to walk so that he would not stiffen up. Even so, Plaintiff alleges that both residents and staff repeatedly complained that he was in the way due to his walker and his slow pace. Plaintiff alleges that this was "outside the medical professional standard norm".



Plaintiff also alleges that on or about March 2, 2015, he went to get his pain medication, that "they" had to page Trapp in order to have him come to do Plaintiff's medication, and that Plaintiff had to "wait 15 minutes". Plaintiff alleges that later that day the Defendant Harnett told him that he should not be in the medication line with his walker, to which Plaintiff responded that he had "no choice in the matter". Plaintiff alleges that Trapp then told him that as long as he did not slow up the line that it was alright. Plaintiff again seeks as relief to be moved back to the Congaree Unit and to have his "green level" restored. Plaintiff also wants to be treated with "dignity and respect".

Plaintiff alleges that on August 28, 2014 he put in a "medical request" concerning issues he was having with his right hand. Plaintiff alleges that on December 10, 2014 he put in another medical request concerning his right hand, this time seeking a brace for it. Plaintiff complains that his problems with his right hand is due to rheumatoid arthritis, that his fingers are no longer in the "normal position", and that if the Defendant Nurse Practitioner Meyers "would have done something a long time ago this might not have happened". Plaintiff also complains that on December 12, 2014 he put in a medical request with Meyers about his tinnitus, and that although Meyers stated that she had referred his request to the medical clinic, his condition has "gotten worse with no help to stop the noise". Plaintiff further complaints that on December 21, 2014 he put in a medical request complaining about numbness in his arms and legs, yet again nothing has been done about it. Plaintiff seeks monetary damages for medical indifference to his condition and complaints.

Plaintiff also complains that on or about March 3, 2015 he was at the barber shop getting a haircut when security came to get him, apparently because Plaintiff had not responded to something on the PA system. Plaintiff alleges that he did not hear anything due to his tinnitus.

7



Plaintiff alleges that he then "struggled" to get up the stairs to go to the Congaree Unit, and that a "Cpl. Davis" told him he would have to get better before he could get a haircut. Plaintiff alleges that this again showed deliberate indifference to his medical needs, because "appearance is an important emotional need for me - I do not like looking as a scruff". Plaintiff also complains that he was not allowed to go outside to get exercise on March 4, 2015, even though the Congaree Unit has a handicap ramp that goes to the recreation area and also a wheelchair lift. Plaintiff alleges he is being discriminated against because of his disability. Plaintiff wants to stop being discriminated against, that both the Edisto and Congaree Units be "brought up to ADA standards", that a lift be installed to the "top level", that a ramp be installed to the rec field, that the showers be "brought up to ADA standards", that the "milieu" be brought up to ADA standards, and that his room be brought up to ADA standards.

Plaintiff also complains that on or about February 28, 2015, when he was sent from the Congaree Unit to the Edisto Unit, they would not let him bring his new mattress or pillows with him. Plaintiff alleges that the mattress and pillow he was assigned were worn out and ripping apart, dirty and not sterilized, and that two such mattresses would only make one of his Congaree mattresses. Plaintiff alleges that on or about December 18, 2014 he put in to get a foam mattress due to his back pain and his rheumatoid arthritis, but that his request was denied by the Defendant Scaturo, Program Director. Plaintiff also complains that he had been diagnosed with COPD and needs to keep his head elevated to be able to breath easier, and that his "worn out pillow" does not give him sufficient elevation. Again, Plaintiff alleges all of this violates his constitutional rights, as well as his rights under the ADA and the Rehabilitation Act. Plaintiff wants to be given a foam mattress and adequate pillows.



Plaintiff has attached as Exhibits to his Complaint copies of several medical requests, most of which indicate that Plaintiff had been seen and his needs addressed, with one of them reading that his request had been referred to the medical clinic. Plaintiff complains that these forms show that "they" make a comment before even checking on his complaint. Plaintiff has also attached copies of some Request to Staff forms in which Plaintiff makes various complaints, and which contain responses such as that Plaintiff has been given the proper equipment or that officials have consulted with medical staff and the clinical staff. Finally, Plaintiff has attached a copy of an order (apparently from another federal court case)[5] which apparently deals with service of process issues. See generally, Plaintiff's Verified Complaint, with attached Exhibits.

In support of summary judgment in the case, the Defendant Jarvis Borum has submitted an affidavit wherein he attests that he is employed as a Sergeant with the SVP Treatment Program. Borum attests that he is responsible for overseeing the safety of the residents and staff of the treatment program, to include supervising and assisting public safety officers and nursing staff in responding to calls for assistance. Borum further attests that he sometimes transports residents to outside medical appointments and performs other security related tasks. Borum attests that the SVP Treatment Program is provided transport vans by the Department of Mental Health to be used when transporting residents to outside medical appointments, among other things, and that every time he has used the van to transport residents to outside medical appointments, the van has always been in working order. He is also not aware of any van being used to transport residents that is not

---

[5]Plaintiff is a frequent filer of litigation in this Court. Aloe Creme Laboratories, Inc. v. Francine Co., 425 F.2d 1295, 1296 (5th Cir. 1970)[a federal court may take judicial notice of the contents of its own records].



in working order, and that if a van has a broken step or some other mechanical issue, it is fixed by the onsite Department of Mental Health maintenance shop.

Borum also attests that pursuant to Department of Mental Health policy, residents are restrained by handcuffs and shackled around the waist when being transported. This is for the safety of the resident as well as others. In addition to being restrained, residents who are being transported are also always buckled in with a seat belt. Borum attests that he has never seen a resident, nor is he aware of a resident, not being buckled in when being transported. See generally, Borum Affidavit.

The Defendant Orlando Dawson has submitted an affidavit wherein he attests that he is employed by the Department of Mental Health as a Behavioral Health Assistant assigned to the SVP Treatment Program. Dawson attests that during his interactions with the Plaintiff, he has always attempted to assist him in his day to day activities with proper care and respect, and has never been intentionally rough with him or intended to harm him in any way. Dawson further attests that while he sometimes pushes Plaintiff around in his wheelchair at the Edisto and Congaree Units, at no time did he ever purposely push Plaintiff into any doorframes or walls. With respect to transport, Dawson attests that when he was involved with taking Plaintiff to the transport van, Plaintiff was always buckled into his seatbelt by either himself or the public safety officer who was assisting with the transport. Dawson attests that at no time did he ever attempt to harm the Plaintiff, nor is he aware of any other SVP Treatment Program employee doing so. See generally, Dawson Affidavit.

The Defendants have also submitted an affidavit from Michael McDuffie, Activity Therapy Supervisor with the SVP Treatment Program. McDuffie attests that his job duties include observing the residents participating in certain physical activities as part of their therapy, and that



he has observed the Plaintiff perform many physical activities while a resident of the Edisto Unit. McDuffie attests that, at various times, he has observed the Plaintiff walk up the stairs of the Edisto Unit to the outside and down another set of stairs in order to play shuffleboard in the recreation area for hours at a time, that Plaintiff will sometimes play singles or doubles with other residents, and that while doing so Plaintiff is required to walk around the floor of the shuffleboard as well as use his arm and shoulder to push the disc down the court. McDuffie further attests that he has observed the Plaintiff walking on the Unit as well as on the recreation yard on multiple occasions without the use of a walker, that he has also observed Plaintiff play the bowling game on the game console located in the Edisto Unit, and that while playing the bowling game Plaintiff is moving his arm rapidly as well as walking towards and away from the game console. See generally, McDuffie Affidavit.

The Defendants have also submitted an affidavit from Dr. Shalini Mittal, who attests that she is employed by the Department of Mental Health as the Director of Non-Psychiatric Medical Service, Division of Inpatient Services. Dr Mittal attests that in this capacity she has seen and treated the Plaintiff as reflected in the medical records attached to her affidavit. Dr. Mittal attests that Plaintiff has been seen and treated for numerous physical complaints and ailments; that he has been regularly followed by the neurology clinic, the orthopedic clinic, and the gastrointestinal clinic; and has been sent for diagnostic testing including x-rays, CT scans, and MRIs on numerous occasions to address his complaints. With respect to Plaintiff's complaints about his care and treatment related to right arm and hand issues, pain and numbness in his lower extremities, and tinnitus, Dr. Mittal attests that Plaintiff has been followed primarily by Dr. Miroslav Kuturic in the neurology clinic.

Dr. Mittal attests that in January 2013, Plaintiff complained of right and left shoulder

11



pain, and that he received x-rays on January 9, 2013, which found that Plaintiff's right AC joint was well-maintained, while there was arthritic spurring of the left AC joint. On January 18, 2013, Plaintiff was seen in the orthopedic clinic and an MRI was ordered to evaluate a possible rotator cuff tear in his right shoulder. When the MRI was conducted on January 29, 2013, no rotator cuff tear was seen. Dr. Mittal attests that Plaintiff was diagnosed with arthropathy in the AC joint with marrow edema. When Plaintiff was subsequently seen in the orthopedic clinic for followup, he was diagnosed with right impingement syndrome and given an injection of Lidocaine in his right shoulder. He was also sent for physical therapy.

Dr. Mittal attests that August 2013 Plaintiff complained of right ankle pain, following which he was seen in the orthopedic on August 9, 2013, where x-rays of his right ankle were normal. Thereafter, on November 8, 2013, Plaintiff was again seen in the orthopedic clinic complaining of right shoulder pain. He received another injection of Lidocaine. Dr. Mittal attests that he saw the Plaintiff for several complaints on May 13, including a complaint of a buzzing sound in both ears. Plaintiff's ear examination was unremarkable, and he was diagnosed with tinnitus. Dr. Mittal attests that after consultation with Dr. Kuturic, he ordered a decrease in Plaintiff's dosage of Neurontin to address his tinnitus. Dr. Mittal attests that Plaintiff was seen again in the orthopedic clinic on May 16, 2014 for complaints of worsening right shoulder pain, and he received another injection of Lidocaine. Plaintiff was thereafter seen in the orthopedic clinic again on September 5, 2014 for continuing complaints of right shoulder pain, and received another injection of Lidocaine.

Dr. Mittal attests that he saw the Plaintiff in the medical clinic on October 16, 2014 for his continued complaint of tinnitus. Plaintiff's ear examination was again unremarkable, and Dr. Mittal noted in his report that Plaintiff's tinnitus was of an unknown etiology. Dr. Mittal attests that



while there are medications that can be used to relieve tinnitus, and he made some changes in Plaintiff's medications to try to address his complaint of tinnitus, that there is no specific cure for tinnitus. Dr. Mittal further notes that tinnitus can often be a side effect of many medications.

Dr. Mittal attests that Plaintiff was seen in the orthopedic clinic again on December 19, 2014 for a complaint of right hand and wrist pain. Plaintiff was requesting a brace for his right hand, but his examination by Dr. Koon was unremarkable. Dr. Koon determined that there was no need for surgery or a brace, and that no orthopedic followup was necessary. Plaintiff received a right shoulder x-ray on April 16, 2015, at which time a "mild" osteoarthritic change of the AC joint was noted.

Dr. Mittal attests that he has not been indifferent nor unresponsive to Plaintiff's medical needs, nor is he aware of any mental health employee being indifferent or unresponsive to his medical needs. Dr. Mittal attests that in his professional opinion, to a reasonable degree of medical certainty, Plaintiff has received, and continues to receive, an appropriate level of care for his diagnosed conditions. Dr. Mittal further attests that the level of care Plaintiff has received in the medical clinic has been appropriate and within the professional standard of care. See generally, Mittal Affidavit, with attached Exhibit (Plaintiff's Medical Records).

The Defendant Michelle Myers[6] has submitted an affidavit wherein she attests that she is employed by the Department of Mental Health as a Nurse Practitioner, and that she works with the SVP Treatment Program. Myers has attached to her affidavit copies of several medical requests Plaintiff has filed in which he contends that she [Myers] has not been responsive to his needs. Myers

---

[6]Correct spelling.

13



attests that on August 28, 2014 Plaintiff sent her a medical request with five issues listed, following which she issued an order on September 2, 2014 referring those issues and others to the orthopedic clinic, GI clinic, the neurology clinic, and to Dr. Hedgepath.  See attached Exhibit B.  Myers attests that she then returned Plaintiff's medical request to him on that same date with an explanation as to which practitioner his complaints were being referred.  Further, Myers attests that Plaintiff was seen in the orthopedic clinic on September 5, 2014, and therefore had the opportunity to address these issues directly with the orthopedist at that time.

Myers attests that Plaintiff submitted another medical request on December 10, 2014, complaining about his right hand and requesting a brace.  Myers attests that on that same date she issued an order referring this matter to the orthopedic clinic and to the medical clinic.  See attached Exhibit C.  Myers then returned Plaintiff's medical request to him that same date with the explanation that the matter had been addressed.  Myers further attests that Plaintiff was seen in the orthopedic clinic on December 19, 2014 for evaluation of his right hand and wrist pain, as well as his request for a brace, which was denied by the orthopedist.

Myers attests that Plaintiff submitted another medical request on December 12, 2014, requesting to have his hearing checked.  Myers attests that she thereafter issued an order referring that issue to the medical clinic December 15, 2014.  See attached Exhibit D.  Myers has also submitted a copy of her notes from December 15 and 16, 2014 regarding this request.  See attached Exhibit E.  Myers attests that, as indicated in these documents, Plaintiff was being treated by Dr. Mittal and Dr. Kuturic for his complaints of tinnitus, and that she also spoke to Plaintiff's treatment case manager, who advised her on December 16, 2014 that Plaintiff had difficulties hearing at a group session held on that date.  Myers attests that, to her knowledge, Dr. Mittal has not made a

14



referral for Plaintiff to be tested by an audiologist.

Myers attests that Plaintiff submitted another medical request on December 21, 2014 asking questions about back surgery and about a referral to a rheumatologist. Myers attests that she met with Plaintiff the following day, December 22, 2014 to answer his questions, and has attached a copy of her notes from that meeting to her affidavit. See attached Exhibit F. Myers attests that, as she discussed with the Plaintiff, none of his physicians had indicated that back surgery was necessary, nor was there any physician order in the medical records directing that a consult with a rheumoatologist be arranged.

Myers attests that, in her professional opinion to a reasonable degree of medical certainty, Plaintiff has received, and continues to receive, an appropriate level of care for his diagnosed conditions. See generally, Myer Affidavit, with attached Exhibits.

The Defendant Mable Pratt has submitted an affidavit wherein she attests that she is a Nurse with the SVP Treatment Program. Pratt attests that as part of her duties as a nurse, she receives medical requests from residents of the SVP Treatment Program, that she responds to those requests as best she can, and that if those requests are outside her areas of experience or training she forwards them to the nurse practitioners. Pratt attests that it is her understanding that if the nurse practitioners are unable to respond to those requests or have questions, they are then forwarded to the medical doctors employed by the treatment program.

Pratt attests that the SVP Treatment Program has one extra wheelchair in its possession that is used for residents who temporarily require the use of a wheelchair. Pratt attests that while this wheelchair was large, it served its purpose as a temporary means of assistance. Pratt attests that at some point while Plaintiff was residing in the Congaree Unit, it was determined that



he could use the wheelchair for a short period of time due to his complaints about not being able to walk, and that Plaintiff was able to utilize the wheelchair despite its size. Pratt further attests that Plaintiff was later issued a walker after he was transferred from the Congaree Unit to the Edisto Unit and showed that he could ambulate around the Edisto Unit. Pratt attests that, to her knowledge, Plaintiff has not currently been prescribed a wheelchair by the medical doctors at the SVP Treatment Program. Pratt also attests that she has not deprived the Plaintiff the use of a wheelchair or a walker, that she has at all times followed the medical directives issued by the medical doctors and nurse practitioners, and has always provided Plaintiff the care that was ordered by these medical professionals. See generally, Pratt Affidavit.

The Defendant Holly Scaturo has submitted an Affidavit wherein she attests that she is the Director of the SVP Treatment Program, which has been established pursuant to the provisions of the South Carolina Sexually Violent Predator Act, S.C.Code Ann. § § 44-48-10 through 44-48-170. Scaturo attests that the residents of the SVP Treatment Program are housed at BCI pursuant to an inter agency agreement between the Department of Mental Health and the SCDC, and are assigned to the Edisto and Congaree Units. Scaturo attests that since Plaintiff has been a resident of the SVP Treatment Program, he has lived in both the Congaree and Edisto Units.

Scaturo attests that while Plaintiff was residing in the Congaree Unit, he was frequently warned that he should stay on the "A" side of Congaree and not go to the "B" side of Congaree. Scaturo attests that when Plaintiff would go the "B" side, he had to walk up and down the stairs, and that when Plaintiff was moved to the "B" side he continued to walk back to the "A" side. Scaturo attests that the medical and clinical staff of the treatment program determined that due to Plaintiff claiming numerous orthopedic and neurological conditions, that it was appropriate to

16



limit him from going up and down stairs. However, she understands that Plaintiff was not compliant with the instructions for him to remain on the "B" side of the Congaree Unit despite claiming that he could not walk. As a consequence, Plaintiff was moved to the Edisto Unit on February 25, 2015. Scaturo attests that this decision was made by the medical and clinical staff of the treatment program within the exercise of their professional judgment.

Scaturo attests that Plaintiff was transported by wheelchair to the "B" side of the Edisto Unit, and that he was able to walk up and down stairs with some assistance at that time. Scaturo attests that Plaintiff was using the wheelchair at that time, but was given a rolling walker the following day, February 26, 2015, which he frequently used and could maneuver in a safe manner. Scaturo attests that the SVP Treatment Staff is able to more closely monitor the Plaintiff in his current location in the "B" side of the Edisto Unit, where he is much closer to the nurse's station which is better suited to handle medically fragile or impaired residents. Scaturo attests that there is also additional staffing in the Edisto Unit, while from a logistical standpoint it is much easier to have Plaintiff transported to his numerous outside medical appointments from his current room. Scaturo attests that, while she understands that Plaintiff would prefer to return to the Congaree Unit, that is not the best option for the staff that must care for him.

Scaturo attests that the Department of Mental Health provides vans for the treatment program to use when transporting residents to outside medical appointments and other occasions when residents need transporting, and that to her knowledge these vans are all in proper working order. Scaturo further attests that if a van is found to not be in proper working order, it is taken to the onsite Department of Mental Health maintenance shop to be repaired. Scaturo attests that she is not personally aware of any van used to transport residents to outside medical appointments having



any type of mechanical issues that would make it difficult for the resident to gain access to the van, and that furthermore the public safety officer transporting the resident assists the resident when entering and exiting the van. Scaturo attests that while the Department of Mental Health does provide at least one handicap accessible van to be used to transport residents, it is reserved for the residents who have specific medical diagnoses that require a handicap accessible van, and that the staff determines which van to utilize for a particular trip based upon availability, scheduling, and the needs of the residents.

Scaturo also attests that with respect to Plaintiff's complaint about not being allowed to take his mattress and pillow with him during his transfer to the Edisto Unit, that all residents receive the same mattress and pillow (which are not personal property - they are state issued), and that Plaintiff received the same type of mattress and pillow when he was reassigned to the Edisto Unit as he had in the Congaree Unit. With respect to Plaintiff's desire to have a foam mattress, Scaturo attests that no special mattress has been ordered for the Plaintiff by any physician; furthermore, there is concern about the use of foam mattresses, as such mattress may present more of a fire hazard.

Scaturo attests that all of the decisions she has made regarding the Plaintiff were made through the exercise of professional judgment and discretion in weighing competing considerations and in light of appropriate professional standards, that all of her discretionary decisions have been made in good faith in the performance of her duties, and that at no time did she violate any of Plaintiff's constitutional rights nor is she aware of any other employees of the Department of Mental Health violating Plaintiff's constitutional rights. See generally, Scaturo Affidavit.



Finally, the Defendants have submitted an affidavit from Dr. Miroslav Kuturic, who attests that he is employed as a neurologist in the Department of Mental Health's medical clinics. Dr. Kuturic attests that in this capacity he has regularly seen and treated the Plaintiff since 2011, as reflected in the medical records attached to his affidavit. Dr. Kuturic attests that he saw the Plaintiff on October 19, 2011 for complaints of right forearm numbness, that Plaintiff was diagnosed with right ulnar nerve entrapment, and was prescribed Gabapentin. He also ordered lab work and scheduled Plaintiff for a followup appointment on November 2, 2011, at which time Plaintiff had no change in his symptoms. Dr. Kuturic attests that he therefore increased Plaintiff's dosage of Gabapentin. He then saw the Plaintiff again on November 16, 2011, at which time Plaintiff was diagnosed with a B12 deficiency and was prescribed B12 supplements. Plaintiff's dosage of Gabapentin was also adjusted at that time. Dr. Kuturic attests that he saw Plaintiff again on December 14, 2011 for monitoring of his B12 deficiency, and prescribed Elavil for pain control on that date.

Dr. Kuturic attests that he next saw the Plaintiff on January 11, 2012, at which time Plaintiff's right arm numbness was improving. Plaintiff was continued on his B12 supplements. When he saw the Plaintiff again on March 12, 2012 for a followup appointment, his condition was still improving. Additional lab work was ordered, and he saw Plaintiff again on May 14, 2012, at which time he noted that Plaintiff's right ulnar nerve entrapment was in remission. Further, Plaintiff's lab work indicated that his B12 level had improved and was within normal limits. Dr. Kuturic saw Plaintiff for a followup appointment on August 12, 2012, at which time it was noted that Plaintiff's right ulnar nerve entrapment was in remission. It was also noted that Plaintiff complained about left hip pain at that visit. Dr. Kuturic found that that complaint was arthritic and not

19



neurological, he ordered a left hip x-ray, and increased Plaintiff's dosage of Elavil. At a followup appointment on November 13, 2012, Dr. Kuturic noted that Plaintiff's right ulnar nerve entrapment was resolved, while the left hip x-rays that had been obtained showed only mild osteoarthritic changes.

Dr. Kuturic saw Plaintiff again on March 11, 2013, at which time he noted that Plaintiff's right nerve entrapment was in remission. Recent lab results showed a slight decrease in his B12 level, so Dr. Kuturic increased Plaintiff's B12 supplement. When he saw Plaintiff again on July 8, 2013, Plaintiff's B12 level had increased, and Dr. Kuturic noted that the B12 deficiency was stable. At Plaintiff's followup appointment on January 13, 2014, Plaintiff complained of back and multi joint pain. X-rays taken the following day showed constipation and "straightening with loss of normal lordosis". It was noted that Plaintiff's right arm pain was resolved. At a followup visit on April 14, 2014, Plaintiff's back and elbow pain had also resolved.

Dr. Kuturic noted that Plaintiff did make a complaint of tinnitus over a four day period, which Dr. Kuturic noted was of an uncertain etiology. A CT scan of the brain was ordered, which was normal. Dr. Kuturic ordered an increase in Plaintiff's dosage of Gabapentin for the tinnitus. When Dr. Kuturic next saw the Plaintiff on July 31, 2014, the tinnitus was unchanged, so he increased Plaintiff's dosage of Gabapentin at that time. On Plaintiff's next visit on November 20, 2014, his tinnitus was stable. However, his dosage of Gabapentin was increased for pain control after Plaintiff complained of left sciatica pain.

Dr. Kuturic attests that when he next saw the Plaintiff on January 15, 2015, he reported pain in "all joints". Plaintiff was subsequently seen in the Richland Memorial Hospital Emergency Room after complaining of right shoulder pain and back pain after playing a bowling



computer game. X-rays taken at the hospital were negative, and Plaintiff's motor examination was normal. Dr. Kuturic attests that he saw the Plaintiff on February 19, 2015, after his discharge from the hospital, at which time he discontinued Plaintiff's Gabapentin and started him on a prescription for Lyrica for back pain. He also ordered an MRI of Plaintiff's lumbosacral spine, as well as physical therapy. When Dr. Kuturic saw Plaintiff again on February 26, 2015, he noted that the MRI of Plaintiff's lumbar spine showed only "minimal" changes with "Baastrups" disease possibly developing at L4-5, without any nerve infringement. Plaintiff's neurological examination was normal, and Dr. Kuturic made an orthopedic referral based on his MRI.

On March 12, 2015, Dr. Kuturic noted that Plaintiff was able to climb onto the examination table without assistance. He ordered a tens unit as well as physical therapy. Plaintiff was thereafter seen by Dr. Koon in the orthopedic clinic on March 13, 2015, at which time Dr. Koon noted that Plaintiff was "ambulating comfortably" and had a normal gait even without the walker. On examination Plaintiff had normal range of motion in his hips, knees, and ankles, and Dr. Koon found no evidence of radiculopathy. He discontinued Plaintiff's use of a walker. At a followup on May 6, 2015, Dr. Kuturic noted that Plaintiff had marked improvement in his pain with the tens unit.

Dr. Kuturic attests that he next saw the Plaintiff on July 14, 2015 to evaluate a request for a wheelchair. Dr. Kuturic attests that Plaintiff appeared stable, that he was ambulating without his walker, and had no weakness on examination. The wheelchair was not recommended, and Plaintiff was encouraged to ambulate and exercise as tolerated. Dr. Kuturic attests that when he saw Plaintiff again on August 11, 2015, Plaintiff was ambulating well without his walker, he had a normal balance, and was able to stand on his toes and balance on one foot.

Dr. Kuturic attests that Plaintiff was referred to Dr. Randall Westerkam for evaluation



of his complaints of bilateral lower extremity pain, numbness and weakness. Additionally, electromyography and nerve conduction studies were performed on August 24, 2015. On examination, Dr. Westerkam found that Plaintiff had a non-antalgic gait, that he was negative for arthritic changes, that he had no atrophy and normal muscle tone, and had 5/5 (full) motor strength. Plaintiff's studies were "normal", with Dr. Westerkam further reporting that Plaintiff's electro diagnostic exam was negative for generalized peripheral polyneuropathy, isolated mononeuropathy, or lumbosacral radiculopathy. See also attached exhibit (Dr. Westerkam's Report). Dr. Kuturic attests that he last saw the Plaintiff on October 12, 2015, and scheduled him for a followup appointment in six months (April 12, 2015).

Dr. Kuturic attests that Plaintiff's subjective complaints are largely unsupported by objective findings, that his neurological examinations have been normal, that the CT scan of his brain was normal, that Plaintiff's electromyography and nerve conduction studies of his lower extremities have been normal, that x-rays show only mild degenerative changes which are normal for a person of his age, that the MRI of Plaintiff lumbosacral spine did not show any neurological issues, and that there is no evidence of myopathy or neuropathy. Dr. Kuturic attests that the best course for the Plaintiff is to ambulate and to exercise, that his B12 deficiency has been stabilized, and that his tinnitus has been treated appropriately. Dr. Kuturic attests that neither he nor any other mental health employee has been indifferent or unresponsive to Plaintiff's medical needs, and that in his professional opinion to a reasonable degree of medical certainty, Plaintiff has received and continues to receive an appropriate level of care for his diagnosed conditions. Dr. Kuturic further attests that the level of care Plaintiff has received in the neurology clinic has been comprehensive and within the professional standard of care. See generally, Kuturic Affidavit, with attached Exhibit.



As attachments to his memorandum in opposition to the Defendants' motion, Plaintiff has submitted a copy (1 of 3 pages) of what purports to be a portion of a Department of Mental Health Policy regarding use of restraints. <u>Plaintiff's Exhibit 1</u>. Plaintiff has also submitted a portion (1 page) of the Defendants' responses to his first set of interrogatories, as well as a copy of what purports to be a Department of Justice Design Guide for Accessible Cells in Correctional Facilities. <u>Plaintiff's Exhibits 2 and 3</u>. Finally, Plaintiff has submitted some hand drawings of what are apparently his cell dimensions and "shower layout". <u>Plaintiff's Exhibit 4</u>.

### Discussion

As noted, the Defendants have moved for summary judgment on all of Plaintiff's claims. Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Rule 56, Fed.R.Civ.P. The moving party has the burden of proving that judgment on the pleadings is appropriate. <u>Temkin v. Frederick County Comm'rs</u>, 945 F.2d 716, 718 (4th Cir. 1991). Once the moving party makes this showing, however, the opposing party must respond to the motion with specific facts showing there is a genuine issue for trial. <u>Baber v. Hosp. Corp. of Am.</u>, 977 F.2d 872, 874-75 (4th Cir. 1992). Further, while the Federal Court is charged with liberally construing a complaint filed by a <u>pro se</u> litigant to allow the development of a potentially meritorious case, <u>see Cruz v. Beto</u>, 405 U.S. 319 (1972); <u>Haines v. Kerner</u>, 404 U.S. 519 (1972), the requirement of liberal construction does not mean that the Court can ignore a clear failure in the pleadings to allege facts which set forth a Federal claim, nor can the Court assume the existence of a genuine issue of material fact where none exists. <u>Weller v. Dep't of Social Services</u>, 901 F.2d 387 (4th Cir. 1990).

23



Here, after careful review and consideration of the arguments and evidence submitted, the undersigned finds for the reasons set forth hereinbelow that the Defendants should be granted summary judgment in this case.

## I.

### (Medical Claim as a Constitutional Violation)

Plaintiff is being held by the State Department of Mental Health pursuant to the provisions of the SVPA. The SVPA and its procedures have been upheld as a constitutionally valid exercise of the State's power to protect citizens from sexually violent predators. In re: Luckabaugh, 568 S.E.2d 338 (S.C. 2002). Under the SVPA, an individual convicted of a sexually violent offense may continue to be held following release from a prison sentence if they are classified as a sexually violent predator; see S.C. Code Ann. § § 44-48-60, 44-48-70; and the SCDC and the Department of Mental Health have entered into an interagency agreement whereby the Sexually Violent Predator Treatment Program residents are housed in a segregated location within the Broad River Correctional Institution (BCI).

As an involuntarily committed patient, Plaintiff retains a liberty interest in receiving reasonable care in a reasonably non-restrictive condition of confinement. Youngberg v. Romeo, 457 U.S. 307, 324 (1982); see Seling v. Young, 531 U.S. 250, 265 (2001) ["[D]ue process requires that the conditions and duration of confinement under the [Sexually Violent Predator] Act bear some reasonable relation to the purpose for which persons are committed"]. As a civilly committed inmate, Plaintiff's custody status most closely resembles that of a pre-trial detainee. Lingle v . Kibby, 526 Fed.Appx. 665, 667 (7th Cir. Apr. 15, 2013) [Civilly committed persons are treated as pretrial detainees]; Valbert v. South Carolina Dep't. of Mental Health, No. 12-1973, 2013 WL



4500455 at * 9 (D.S.C. Aug. 20, 2013) [same]; Treece v. McGill, No. 08-3909, 2010 WL 3781695 at * 4 (D.S.C. Sept. 21, 2010)["A civilly committed individual under the SVPA most closely resembles the custody status of a pre-trial detainee."] (quoting LaSure v. Doby, No. 06-1527, 2007 WL 1377694 at * 5 (D.S.C. May 8, 2007); Tillman v. Dixon, No. 10-5032, 2011 WL 5119187 at * 9 (W.D.Wash. Aug. 12, 2011)[The rights of those civilly committed are analyzed using same standards that apply to pretrial detainees], adopted by, 2011 WL 5118750 (W.D.WAsh. Oct. 27, 2011); cf. Larch v. Gintoli, 04-1962, 2006 WL 895019, at ** 3-4 (D.S.C. Mar. 31, 2006). Therefore, Plaintiff's conditions of confinement claim is evaluated under the due process clause of the Fourteenth Amendment. Bell v. Wolfish, 441 U.S. 520, 535, n. 16 (1979); but see also Martin v. Gentile, 849 F.2d 863, 870 (4th Cir. 1988) [Holding that the Fourteenth Amendment guarantees at least Eighth Amendment protections].

   Plaintiff is alleging that his constitutionally protected rights are being violated because he is receiving inadequate medical treatment and care for his complaints. However, although the named Defendants are state employees, and are therefore subject to suit for damages in their individual capacities under 42 U.S.C. § 1983, liability may be imposed only when evidence is submitted to show that "the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment". Youngberg, 457 U.S. at 323. Further, "[i]n determining whether the State has met its obligations . . . decisions made by the appropriate professional are entitled to a presumption of correctness. Such a presumption is necessary to enable institutions of this type . . . to continue to function". Id, at 324. Considered under this standard, Plaintiff has failed to set forth evidence to establish a genuine issue of fact that he has been provided



with improper medical care and treatment sufficient to state a constitutional claim.

In order to avoid summary judgment, Plaintiff would need to have submitted evidence sufficient to create a genuine issue of fact as to whether any named Defendant was deliberately indifferent to his serious medical needs.  Estelle v. Gamble, 429 U.S. 97, 106 (1976); Farmer v. Brennen, 511 U.S. 825, 837 (1994); Sosebee v. Murphy, 797 F.2d 179 (4th Cir. 1986); Wester v. Jones, 554 F.2d 1285 (4th Cir. 1977); Russell v. Sheffer, 528 F.2d 318 (4th Cir. 1975); Belcher v. Oliver, 898 F.2d 32 (4th Cir. 1990); Kollyns v. Chavez, No. 05-3022, 2006 WL 2459484, at * 2 (D.S.C. Aug. 23, 2006) ["To state a claim pursuant to the Fourteenth Amendment requires a plaintiff to provide proof of more than mere negligence in diagnosing and treating medical complaints"].[7] Plaintiff has failed to submit any such evidence.  Indeed, except with respect to the Defendants Myers, Trapp and Pratt, Plaintiff has not set forth any allegations that any of the other Defendants were even involved in his medical care, or that any of these other Defendants made any decisions about what type of care and treatment Plaintiff was to receive.  Therefore, none of these other named Defendants are subject to any liability for Plaintiff's claims arising out of his medical care.  Cf. Shakka v. Smith, 71 F.3d 162, 167 (4th Cir. 1995) [officials entitled to rely on judgment of medical personnel]; Miltier v. Beorn, 896 F.2d 848, 854 (4th Cir. 1990) [officials entitled to rely on expertise

---

[7]Although some of these case cites deal with the Eighth Amendment rights of convicted prison inmates, while, as a civilly committed inmate, Plaintiff's claims are evaluated under the Due Process clause of the Fourteenth Amendment, for purposes of consideration of Plaintiff's claims, the standard for whether Plaintiff received constitutionally adequate medical care and/or his conditions of confinement meet constitutional muster is essentially the same as that of a convicted prisoner.  See Martin, 849 F.2d at 870 [Holding that the 14th Amendment guarantees at least 8th Amendment protections]; Estate of Miller, ex. Rel. Bertram v. Tobiasz, 680 F.3d 984, 989 (7th Cir. 2012)[The same standard applies for determining claims of deliberate indifference to the serious medical conditions of pretrial detainees and incarcerated individuals, though pursuant to the Fourteenth Amendment for pretrial detainees rather than the Eight Amendment.].



of medical personnel]; see also Levy v. State of Ill. Dept. of Corrections, No. 96-4705, 1997 WL 112833 (N.D.Ill. March 11, 1997) ["A defendant acts with deliberate indifference only if he or she 'knows of and disregards' an excessive risk to inmate health or safety.'"], quoting Farmer v. Brennan, 511 U.S. at 837.

Even with respect to the Defendants Myers, Trapp and Pratt, there is no evidence before the Court to show that any of these three (3) Defendants violated Plaintiff's constitutional rights. The Defendants have provided affidavits from medical professionals (two physicians, a nurse practitioner, and a nurse), in addition to voluminous medical records, all reflecting that Plaintiff received prompt and appropriate care for his medical problems and complaints. By contrast, Plaintiff has presented no medical evidence whatsoever in support of his allegations that he received constitutionally inadequate medical care. Rather, Plaintiff sets forth only his own lay opinion that the medical care and treatment he received was inadequate. Such lay statements and complaints, without any supporting medical evidence, are not sufficient to avoid summary judgment. House v. New Castle County, 824 F.Supp. 477, 485 (D.Md. 1993) [Plaintiff's conclusory allegations insufficient to maintain claim]; cf. Malik v. Sligh, No. 11-1064, 2012 WL 3834850, at * 5 (D.S.C. September 4, 2012), aff'd. 507 Fed. Appx. 294 (4th Cir. 2013) [Finding that a self serving affidavit from the Plaintiff was "simply not enough to create a genuine dispute as to any material fact" in light of the other evidence that disputed the credibility of Plaintiff's self serving claims]; see also Drakeford v. Thompson, No. 09-2239, 2010 WL 4884897, at * 3 (D.S.C. November 24, 2010), citing Larken v. Perkins, 22 Fed. Appx. 114, 115 (4th Cir. 2001)[Noting that non-movant's "own, self-serving affidavit containing conclusory assertions and unsubstantiated speculation, . . . [is] insufficient to stave off summary judgment"]. Hence, under these facts, the mere allegations of

27



Plaintiff's Complaint, standing alone and without any supporting evidence, are simply not sufficient to allow this claim to proceed as a constitutional violation for deliberate indifference to a severe medical condition. Green v. Senkowski, 100 Fed.Appx. 45 (2d Cir. 2004) (unpublished opinion) [finding that plaintiff's self-diagnosis without any medical evidence insufficient to defeat summary judgment on deliberate indifference claim].

While Plaintiff may not agree with the extent and nature of the medical care he received, he cannot simply allege in a conclusory fashion that he did not receive constitutionally adequate medical care or attention, otherwise provide no supporting evidence other than his own subjective opinion, and expect to survive summary judgment, particularly when the Defendants have submitted medical records as well as sworn testimony from medical professionals which refute his claims. See House, 824 F.Supp. at 485 [Plaintiff's conclusory allegations insufficient to maintain claim]; Morgan v. Church's Fried Chicken, 829 F.2d 10, 12 (6th Cir. 1987) ["Even though pro se litigants are held to less stringent pleading standards than attorneys the court is not required to 'accept as true legal conclusions or unwarranted factual inferences.'"]; see Scheckells v. Goord, 423 F.Supp. 2d 342, 348 (S.D.N.Y. 2006) (citing O'Connor v. Pierson, 426 F.3d 187, 202 (2d Cir. 2005) ["Lay people are not qualified to determine...medical fitness, whether physical or mental; that is what independent medical experts are for."]); Levy, No. 96-4705, 1997 WL 112833 ["A defendant acts with deliberate indifference only if he or she 'knows of and disregards' an excessive risk to inmate health or safety.'"].

Plaintiff's personal opinion notwithstanding, nothing in the evidence and exhibits before the Court gives rise to a genuine issue of fact as to whether any named Defendant was deliberately indifferent to Plaintiff's serious medical needs. Wright v. Collins, 766 F.2d 841, 849



(4th Cir. 1985)[Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim absent exceptional circumstances]. Therefore, Plaintiff's medical claim is without merit and should be dismissed.

## II.

### (Constitutional Conditions of Confinement Claims)

Plaintiff's remaining allegations, asserted as constitutional claims, are essentially a hodge podge of complaints about the general conditions of his confinement. Plaintiff does not like where his cell is located; that he occasionally had to walk up or down six steps; that the van he rode in had a broken step; that he did not get the mattress and pillow he wanted; that the size of the wheelchair he used made it difficult for him to get to the exercise area or to the area to watch television; that the security officer who helped him get dressed was too "rough" and did not treat him gently enough; that the wheels on the walker he was assigned were the wrong kind; that he does not think he should be put in shackles when being transported; and the like. As presented, these claims do not "demonstrate any deprivation of a constitutional magnitude". Treece, 2010 WL 3781695 at * 5; see also Dudley v. Food Service - Just Care, 519 F.Supp.2d 602, 607 (D.S.C. 2007) [Youngberg standard applies to claims that are non-medical in nature].[8]

Plaintiff's complaint about the location of his cell and/or his desire to be transferred to a different housing unit, by itself and without any evidence showing that a constitutional violation has occurred, is insufficient to maintain a claim. Cf. Marchesani v. McCune, 531 F.2d 459, 462 (10th Cir. 1976), cert. denied, 429 U.S. 846 (1976)[classification generally upheld unless inmate

---

[8]To the extent any of these allegations can be considered as part of his medical claims, they are without merit for the reasons set forth in Section I of this opinion, supra.



proves arbitrary and capricious or a clear abuse of discretion]; Neals v. Norwood, 59 F.3d 530, 533 (5th Cir. 1995) ["[A] prison inmate does not have a protectable liberty or property interest in his custodial classification and an inmate's disagreement with a classification is insufficient to establish a constitutional violation."]; Meachum v. Fano, 427 U.S. 215, 225 (1976) [Fourteenth Amendment liberty interest is not implicated merely because a prisoner is transferred within an institution or subjected to more severe rules]; cf. Youngberg, 457 U.S. at 323 [liability may be imposed only when evidence is submitted to show that "the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment"].

Similarly, Plaintiff's claims relating to his wheelchair occasionally being banged into a door frame or that the individual assigned to assist him getting dressed was too "rough" are also, by themselves, insufficient to set forth a constitutional claim. Cf. Wilson v. Cook County Bd. of Commissioners, 878 F.Supp. 1163, 1167-1168 (N.D.Ill. 1995) [pretrial detainee failed to establish that conditions in detention facility violated his due process rights where detainee failed to allege remedial injury]; see Paul v. Davis, 424 U.S. 693, 701 (1976) [not every claim which may set forth a cause of action under a state tort law is sufficient to set forth a claim for a violation of a constitutional right]. The remainder of Plaintiff's claims simply reflect a general dissatisfaction with the fact of Plaintiff's continued incarceration and the less than perfect conditions under which individuals subject to such incarcerations are held. However, while Plaintiff's dissatisfaction with his situation and the fact that he is continuing to be held past the expiration of his sentence is

30



certainly understandable, that does not mean that a constitutional violation has occurred.[9]  No such

violation has been shown by the evidence submitted in this case.  Levy, No. 96-4705, 1997 WL

112833 ["A defendant acts with deliberate indifference only if he or she 'knows of and disregards'

an excessive risk to inmate health or safety.'"]; Patten v. Nichols, 274 F.3d 829, 843 (4th Cir.

2001)[Defendant's actions must have "so substantially departed from professional standards that

their decisions can only be described as arbitrary and unprofessional"].

By reaching the conclusion that no compensable constitutional violation has been

shown in the evidence, the undersigned does not intend to signal a lack of concern over Plaintiff's

complaints.  However, while Plaintiff may have some state law claim or administrative process he

could pursue, absent some evidence of a significant injury suffered by the Plaintiff as a result of

conditions deemed to be unconstitutional, or other accompanying factors not present in this case, the

undersigned does not find that Plaintiff has presented a genuine issue of fact as to whether the

conditions under which he is being held amount to a violation of his constitutional rights sufficient

to survive summary judgment.  See DeShaney v. Winnebago County Dep't of Social Servs., 489

U.S. 189, 200-203 (1989) [§ 1983 does not impose liability for violations of duties of care arising

under state law]; Baker v. McClellan, 443 U.S. 137, 146 (1976) [§ 1983 claim does not lie for

violation of state law duty of care].  Therefore, Plaintiff claims (considered as claims for

unconstitutional conditions of confinement) should be dismissed.

---

[9]As previously noted, the SVPA and its procedures have been upheld as a constitutionally valid exercise of the State's power to protect citizens from sexually violent predators.  In re: Luckabaugh, supra.



### III.

### (ADA/Rehabilitation Act Claim)

With respect to any claims Plaintiff is asserting pursuant to the ADA or § 504 of the Rehabilitation Act, no Defendant named in this case is subject to liability under either one of those statutes. Cf. Smith v. South Carolina Department of Corrections, No. 03-795, 2003 WL 23851177, at n. 1 (D.S.C. Aug. 11, 2003); Anderson v. South Carolina Department of Corrections, No. 09-402, 2009 WL 5031305 at n. 7 (D.S.C. Dec. 14, 2009). Therefore, these claims are subject to dismissal for failure of the Plaintiff to sue a proper party Defendant with respect to these claims.

Additionally, even if Plaintiff had sued the proper party Defendant (which in this case would have been the South Carolina Department of Mental Health, which is a state agency), States have sovereign immunity from suit under Title II of the ADA absent a corresponding constitutional violation. See Wessel v. Glendening, 306 F.3d 203 (4th Cir. 2002), overruled in part by United States v. Georgia, 546 U.S. 151, 159 (2006). Hence, as the undersigned has already found that Plaintiff has failed to submit evidence sufficient to give rise to a genuine issue of fact as to whether a constitutional violation has occurred in this case, Plaintiff's claims under the ADA would be subject to dismissal even if a proper party Defendant had been named, and must therefore be dismissed. Cf. Capell v. Carter, No. 13-586, 2014 WL 197756 (D.S.C. Jan. 16, 2014); but see, Sossamon v. Texas, 131 S.Ct. 1651, 1662 (2011) [Discussing sovereign immunity with respect to Rehabilitation Act claim].

### IV.

### (Omnibus Adult Protection Act)

Plaintiff also references the Omnibus Adult Protection Act in his Complaint. See



S.C.Code Ann. § 43-35-5, et seq.  However, while a private cause of action may exist under the Omnibus Adult Protection Act, Plaintiff in this case states that he is sending this Complaint to the Department of Public Safety and the Vulnerable Adults Investigations Unit of the South Carolina Law Enforcement Division ("SLED").[10]  See Amended Complaint, p. 6; see also Williams-Garrett v. Murphy, 106 F.Supp.2d 834, 843 (D.S.C. 2000)[Finding a private cause of action exists under the Omnibus Adult Protection Act].  Therefore, Plaintiff may be simply referencing that he is reporting his complaints to an investigative entity under the Act.  See S.C. Code § 43-35-10(5).  However, even assuming that Plaintiff intended to pursue a private action under this Act, he has failed to name a proper party defendant for any state law claims being asserted, as the private cause of action provided for would be a tort for "abusing, neglecting, or exploiting" a vulnerable adult as defined in the Act.  Williams-Garrett, 106 F.Supp. 2d at 843.  The South Carolina Tort Claims Act provides that the proper party Defendant for any such claim would be the Department of Mental Health.  See S.C. Code Ann. § 15-78-70(c).  Therefore, any such claim would be subject to dismissal for failure to name a proper party Defendant.[11]

_____

[10]Since Plaintiff is in a facility operated by the Dept. of Mental Health, he is considered a "vulnerable adult" under the statute and protected.  See S.C. Code Ann. § § 43-35-10 and 43-35-10(4).

[11]Defendants also assert that, even if Plaintiff had named the Department of Mental Health as the party Defendant for this state law claim, it would be subject to dismissal because, in enacting the South Carolina Tort Claims Act, the State specifically retained its Eleventh Amendment immunity from suit in federal court.  See S.C.Code Ann. § 15-78-70(a).  However, by removing this case to federal court from state court, the State has waived any immunity it had from suit (if Plaintiff had named the proper party Defendant) as to any claims to which the State has made itself subject to suit in state court.  Lapides v. Board of Regents of the Univ. System of Georgia, 535 U.S. 613, 619 (2002)[A state's voluntary appearance in federal court waives sovereign immunity to claims where a state has consented to suit in its own courts for such claims]; see also Cameron v. Cox, No. 10-1278, 2011 WL 1235308 at * 4 (D.S.C. Jan. 21, 2011) adopted by, 2011 WL 1212177 (D.S.C. Mar.
(continued...)



Moreover, even if Plaintiff *had* named a proper party Defendant, since the federal claims Plaintiff is asserting are subject to dismissal, this Court should not retain jurisdiction over this exclusively state law cause of action in any event.  See Lovern v. Edwards, 190 F.3d 648, 655 (4th Cir. 1999) ["[T]he Constitution does not contemplate the federal judiciary deciding issues of state law among non-diverse litigation"].  Rather, when federal claims presented in a case originally filed in state court are dismissed, any remaining state law claims should be remanded back to state court for resolution under the general doctrine developed in United Mine Workers v. Gibbs, 383 U.S. 715 (1966). See In Re Conklin, 946 F.2d 306, 324 (4th Cir. 1991); Nicol v. Imagematrix, Inc., 767 F.Supp. 744, 746, 749 (E.D.Va. 1991); Mills v. Leath, 709 F.Supp. 671, 675-676 (D.S.C. 1988); Carnegie-Melon v. Cohill, 484 U.S. 343 (1988); Taylor v. Waters, 81 F.3d 429, 437 (4th Cir. 1996). This doctrine recognizes the state court's role in determining whether dismissal of state law claims is warranted, and, if such a dismissal were to be denied, that it would be much more appropriate for

---

[11](...continued)

30, 2011).  Therefore, if Plaintiff had named the proper party Defendant for his state claim, by removing this case, the State's immunity from suit in this Court for any claim allowable under the South Carolina Tort Claims Act would be waived.

However, this waiver of immunity does not extend to claims for which the State has not waived its immunity from suit in state court. Cf. Stewart v. North Carolina, 393 F.3d 484, (4th Cir. 2005)[finding no waiver where state has not consented to suit in its own courts for such claims]. The State of South Carolina has not consented to suit for damages for federal constitutional violations, even in its own courts, as the South Carolina Torts Claim Act expressly waives the State's immunity from suit in state court only for specified state tort causes of action. See S.C. Code Ann. § 15-78-20(b), (e); cf. Bergemann v. Rhode Island Dep't of Environmental Management, 665 F.3d 336, 342-343 (1st Cir. 2011); Lombardo v. Pennsylvania Dep't. of Public Welfare, 540 F.3d 190, 198-199 (3d Cir. 2008) ["We hold that while voluntary removal waives a State's immunity from suit in a federal forum, the removing State retains all defenses it would have enjoyed had the matter been litigated in state court, including immunity from liability]; Embury v. King, 361 F.3d 562 (9th Cir. 2004). Therefore, the State's immunity from suit for Plaintiff's constitutional claims is not effected by the removal of this case.

34



any such state law claims to be considered and tried by the state courts.

**Conclusion**

Based on the foregoing, it is recommended that the Defendants' motion for summary

judgment be **granted**, and that his case be **dismissed**.[12]

The parties are referred to the Notice Page attached hereto.

_____
Bristow Marchant
United States Magistrate Judge

April 13, 2016
Charleston, South Carolina

---

[12]If the Court adopts the recommendations set forth herein with respect to Plaintiff's federal claims, then out of an abundance of caution, and in consideration of Plaintiff's pro se status, the Court may want to consider remand of Plaintiff's state law claim to the state courts for disposition, rather than outright dismissal of this claim at this time.

35



**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

